IN the MATTER OF DISCIPLINARY PROCEEDINGS AGAINST
John W. STRASBURG, Attorney at Law.

Supreme Court

*No. 96-0305-D. Submitted on briefs September 9,
1997.—Decided April 21, 1998.*

(Also reported in 577 N.W.2d 1.)

For John W. Strasburg there were briefs by *Steven M. Epstein* and *Law Offices of Steven M. Epstein*, Milwaukee.

For the Board of Attorneys Professional Responsibility there was a brief by *Dennis M. Sullivan* and *Sullivan & Stevenson*, Milwaukee.

¶ 1. PER CURIAM. John W. Strasburg appealed from that portion of the referee's report recommending that he be required to make restitution to a business client for an excessive fee he had charged and obtained, that he be required to pay the costs of this disciplinary proceeding, and that the court impose a remedial sanction for his contempt of this court for each day following the issuance of the court's opinion in this proceeding that he engages in those business activities he pursued while his license to practice law was suspended that the referee found constituted the practice of law. Mr. Strasburg did not appeal from the referee's recommendation that his license to practice law in Wisconsin be revoked as discipline for having engaged in the practice of law and in law work activity customarily done by law students, law clerks or other paralegal personnel while his license to practice law was suspended, for misrepresenting on a statutory power of attorney that he had witnessed the signature of the grantee of the power in her presence and directing or knowingly allowing his employee to represent falsely that she had witnessed the grantor's signature and had notarized it in the presence of the grantor and the grantee, and for failing to cooperate in

319

the investigation of the Board of Attorneys Professional Responsibility (Board) into these matters.

¶ 2.   We determine that Mr. Strasburg's conduct, particularly his continuing to engage in activities prohibited by our rules to an attorney whose license to practice law has been suspended, warrants the revocation of his license to practice law. In his business activities following the disciplinary suspension of his license to practice law, Mr. Strasburg has attempted to use his position of attorney to induce others to retain his services, at times to the extent of suggesting that he was authorized to practice law in connection with those services. By so doing, Mr. Strasburg sought to accomplish precisely what the prohibition we impose on lawyers suspended or disbarred from practice is designed to prevent. We determine further that the remedial sanction recommended by the referee for Mr. Strasburg's continuing contempt of this court's license suspension order imposing that prohibition is the appropriate means of protecting the public from any further contemptuous misconduct by Mr. Strasburg in the pursuit of his business. In respect to the unearned retainer he obtained from a business client while purporting to have the professional status of an attorney, we order the restitution recommended by the referee. In addition, we require Mr. Strasburg to pay the full costs of this disciplinary proceeding.

¶ 3.   Mr. Strasburg was admitted to practice law in Wisconsin in 1972 and practiced in Milwaukee. In 1990, the court suspended his license for two years as discipline for charging a clearly excessive fee and threatening legal action for his fee prior to completing the legal work in an estate, for overbilling several clients, for allowing a relative of a client to direct his professional judgment and legal services on behalf of

that client and failing to communicate with the client prior to taking actions on her behalf, and for acting in the presence of conflicting interests of a client and the client's mother, whose assets he was transferring to the client, and charging a clearly excessive fee for the routine legal services he provided in that matter. *Disciplinary Proceedings Against Strasburg*, 154 Wis. 2d 90, 452 N.W.2d 152

¶ 4. In its complaint and amended complaint in the instant proceeding, the Board alleged that while his license to practice law remained suspended, Mr. Strasburg engaged in the practice of law and in law work activity customarily done by law students, law clerks and other paralegal personnel, contrary to SCR 22.26(2),[1] engaged in misrepresentation by failing to inform potential clients who asked if he was an attorney that his license had been suspended, charged unreasonable "legal fees" in several matters, misrepresented to a client that he was an attorney when his license to practice law remained suspended, used trust assets obtained from a client for matters unrelated to that trust and placed some of those assets in accounts other than trust accounts, failed to notify beneficiaries of the existence of that trust and provide them annual statements of his administration of it, misrepresented to the client the account balance of a portion of that trust, and failed to respond to inquiries from the Board concerning his conduct and refused to produce his

---

[1] SCR 22.26 provides, in pertinent part:

**Activities on revocation or suspension of license.**

. . .

(2) A suspended or disbarred attorney may not engage in the practice of law or in any law work activity customarily done by law students, law clerks or other paralegal personnel, except that he or she may engage in law related work for a commercial employer not itself engaged in the practice of law.

records of the matters under investigation. In response, Mr. Strasburg denied many of those allegations, insisting that his business activities did not constitute the practice of law. Thereafter, Mr. Strasburg refused to appear for a deposition scheduled by the Board and attended the rescheduled deposition only to assert his Fifth Amendment right in refusing to respond to each of the Board's initial two questions, one of which asked where he had attended law school. He stated that he would assert that right in response to any subsequent question that might be asked, whereupon he left the deposition. In response to his failure to attend the deposition, the referee, Attorney Norman Anderson, struck Mr. Strasburg's responsive pleading and granted the Board's motion for default judgment.

¶ 5. When it commenced this proceeding, the Board filed a motion asking that Mr. Strasburg be held in contempt of the court's 1990 suspension order for continuing to practice law, in violation of SCR 22.26(2), and that a remedial sanction be imposed for that contempt. We directed the referee to hold a hearing on the contempt motion at the same time as the hearing on the Board's disciplinary complaint and to file a recommendation for a remedial sanction for the contempt, if any were found. After granting the Board's default judgment and contempt motions and holding a hearing on the appropriate contempt sanction to be imposed, the referee recommended a remedial contempt sanction of a $500 per day forfeiture for each day Mr. Strasburg continues to violate SCR 22.26(2) by engaging in the activities described in the amended complaint. The factual basis of the referee's contempt finding is as follows.

¶ 6. Prior to the suspension of his license in 1990, Mr. Strasburg established ElderCare Asset Protection

Plans, Inc. (ElderCare), a business corporation he served as president and treasurer that provided advice and services concerning financial planning and qualification for Title 19 (Medicaid) benefits. In the course of that business, Mr. Strasburg prepared a variety of legal documents, including trusts, powers of attorney, living wills, declarations to physicians, and health care powers of attorney, all designed to transfer and preserve through divestiture the assets of persons, usually elderly, infirm or both, and render them eligible for medical assistance. Mr. Strasburg also prepared deeds and provided other assistance in the transfer of assets and property. In addition to himself, ElderCare had two office personnel, who were responsible for answering telephones, sending out marketing material to prospective clients, and preparing under his direction documents such as trusts, durable powers of attorney, health care powers of attorney, living wills, and deeds. The business did not employ a licensed attorney to advise clients, prepare legal documents, or review documents prepared by Mr. Strasburg or his staff.

¶ 7.  While disclaiming that it was a law firm, ElderCare's marketing material stated that it was comprised of "Title 19 estate planning specialists" and that it "provides a completely legal family financial and estate plan" and guides its clients "through the proper, legal steps" to protect parents' assets. That material identified Mr. Strasburg as "John W. Strasburg, J.D., Marquette University Law School, 1972." Advertisements for ElderCare stated that its counseling "will qualify parents for Title 19 (Medicaid), provide a unified system to administer and protect their assets, and eliminate probate after their death" and can help prevent "entire life savings and other assets from being wiped out if age or illness overtakes [them]." It

323

encouraged people to "get sound advice and avoid costly mistakes or possible Medicaid disqualification before applying for Title 19."

¶ 8. Finding as fact by default the Board's allegations that Mr. Strasburg drafted trusts and advised clients regarding trusts, wills, and powers of attorney, the referee stated, "To advise clients regarding trusts and their consequences and to draft such instruments and to charge fees for doing so is unquestionably, in the mind of this Referee, the practice of law," in violation of SCR 22.26(2). Noting the potential applicability of the statute proscribing the unauthorized practice of law, Wis. Stat. § 757.30, he said, "Although the unauthorized practice of law also constitutes a criminal offense, the Supreme Court in exercising its responsibility to govern the practice of law should not be wholly dependent upon the discretion of local prosecuting attorneys to enforce its rules."

¶ 9. In addition to the contempt, the referee made findings consistent with the Board's allegations in respect to Mr. Strasburg's conduct in six Eldercare matters. In the first of those, a woman and her brother met with Mr. Strasburg to discuss their mother's qualification for Title 19 benefits, having read ElderCare's newspaper advertisements. When the woman asked if he was an attorney, Mr. Strasburg said he was and gave her a business card identifying himself as "John W. Strasburg, J.D." but did not tell her that his license to practice law had been suspended since 1990. He told these people he would prepare a trust, a durable power of attorney, a health care power of attorney, and a living will for their mother for a fee of $600, plus an $800 fee to be paid to a title company for recording those documents. After paying him a consultation fee of $150, the woman decided to look into Mr. Strasburg's

credentials and contacted the Board, among others. When she learned of his license suspension, she filed a grievance with the Board.

¶ 10. In another matter, a woman and her sister met with Mr. Strasburg in June, 1994, to discuss the divestiture and preservation of their father's assets and his Title 19 qualification. The outline of services he gave the woman stated that Mr. Strasburg would prepare a trust, a physician's declaration and, if the documents they already had were inadequate, a durable power of attorney and a health care power of attorney. When the woman subsequently contacted several attorneys for a cost comparison for those services, she learned that they would perform the same or similar services for less than half the $5000 fee Mr. Strasburg was charging. The woman telephoned Mr. Strasburg in July to terminate his services and requested a refund of the unused $2500 retainer she had paid him, but Mr. Strasburg refused to refund any portion of it.

¶ 11. In September, 1994, a woman met with Mr. Strasburg seeking to obtain assistance for her husband. The woman apparently was confused about the services his business offered, for she was seeking assistance such as meal service. Mr. Strasburg drove the woman to a bank so she could get a cashier's check for $3000 for his fee. The woman later asked him to refund the money, but he refused.

¶ 12. In the course of its investigation into these matters, Mr. Strasburg refused to respond to the Board's investigators and to the district professional responsibility committee. Ultimately, in January, 1995, he wrote to the Board acknowledging receipt of its most recent letter requesting an interview but refused to appear, asserting that he had submitted to

this court a written resignation of his membership in the State Bar of Wisconsin. The Board then attempted to serve a notice of investigative meeting on Mr. Strasburg at his office, and two days thereafter his signature was notarized on the petition for voluntary resignation from the State Bar subsequently filed with the court. We held that petition in abeyance pending disposition of the Board's investigation and any disciplinary proceeding that might ensue.

¶ 13.   In April, 1995, a man and his brother met with Mr. Strasburg to discuss the preservation of their mother's assets. The man had learned of ElderCare through a radio advertisement, as a result of which he believed Mr. Strasburg was an attorney. At that meeting, Mr. Strasburg gave the man his business card with the notation "John W. Strasburg, J.D." and stated that he had a law degree. He did not, however, tell the man then or at anytime thereafter that his license to practice law had been suspended or that he was not authorized to practice law.

¶ 14.   During that meeting, Mr. Strasburg stated that he could preserve up to half of the mother's assets, estimated at $18,000, and said he would prepare a trust and a power of attorney for a $2800 fee. The following day, the man learned that Mr. Strasburg's license to practice law had been suspended and decided not to retain him. The man filed a grievance with the Board, and Mr. Strasburg did not respond to three letters from the Board requesting information about the matter.

¶ 15.   In March, 1994, a woman contacted Elder-Care concerning the preservation of her father's assets after seeing an advertisement for the business in the newspaper. All contacts between the woman and Mr. Strasburg were by telephone or by mail; they never met

in person. Mr. Strasburg had no communication with the woman's father but agreed to handle the divestiture of his assets and qualification for Title 19 benefits for a fee of $3700, which was paid from the father's assets in April, 1994.

¶ 16. Mr. Strasburg sent the daughter a packet of documents, including a statutory power of attorney and a trust, to review with her father, have them executed, and return to him. The statutory power of attorney set forth that it had been signed by the daughter and by her father on May 18, 1994, some six weeks after the father had been declared medically incapable of understanding or exercising his rights and responsibilities for health care as a result of organic brain syndrome and dementia.

¶ 17. The power of attorney had a space for the signature of a witness to the daughter's signature and a space for the notarization of her father's signature, but the document was neither witnessed nor notarized at the time they signed it. When he received the unwitnessed and non-notarized power of attorney, Mr. Strasburg and one of his employees signed as witnesses to the daughter's signature, and the employee notarized the father's signature, notwithstanding that neither the daughter nor the father signed the document in their presence and that the employee had never met or even spoken with the father.

¶ 18. Mr. Strasburg did not respond to the Board's letter requesting information in the course of its investigation into this matter, and he refused delivery of a certified letter from the Board. He also failed to appear as directed at an investigative meeting and produce his file and billing records.

¶ 19. On the basis of those facts in these matters, the referee concluded that Mr. Strasburg engaged in

conduct involving dishonesty, fraud, deceit or misrepresentation, in violation of SCR 20:8.4(c), by failing to inform potential clients of ElderCare who asked if he was an attorney that his license to practice law was suspended and by misrepresenting on a statutory power of attorney that he had witnessed the grantee's signature in her presence and by directing or knowingly allowing his employee to represent falsely that she had witnessed the grantor's signature and had notarized it in their presence. He also engaged in the practice of law and in law work activity customarily done by law students, law clerks and other paralegal personnel, in violation of SCR 22.26(2) and 20:5.5(a),[2] by his work with ElderCare following the suspension of his license, including his drafting powers of attorney, wills, and trusts. His charging an unreasonable legal fee for work to be performed in protecting the assets of three persons violated SCR 20:1.5(a).[3] By leading a

---

[2] SCR 20:5.5 provides, in pertinent part:

**Unauthorized practice of law**
A lawyer shall not:
    (a)   practice law in a jurisdiction where doing so violates the regulation of the legal profession in that jurisdiction;

[3] SCR 20:1.5 provides, in pertinent part:

**Fees**
    (a)   A lawyer's fee shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following:
    (1)   the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal services properly;
    (2)   the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
    (3)   the fee customarily charged in the locality for similar legal services;
    (4)   the amount involved and the results obtained;

business client to believe he was an attorney authorized to practice law, Mr. Strasburg made a false or misleading communication about himself and his services, in violation of SCR 20:7.1(a).[4] Finally, his failure to cooperate with the Board's investigation violated SCR 22.07(2) and (3)[5] and 21.03(4).[6]

(5)   the time limitations imposed by the client or by the circumstances;

(6)   the nature and length of the professional relationship with the client;

(7)   the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8)   whether the fee is fixed or contingent.

[4] SCR 20:7.1 provides, in pertinent part:

**Communications concerning a lawyer's services**

(a)   A lawyer shall not make a false or misleading communication about the lawyer or the lawyer's services. A communication is false or misleading if it:

(1)   contains a material misrepresentation of fact or law, or omits a fact necessary to make the statement considered as a whole not materially misleading;

(2)   is likely to create an unjustified expectation about results the lawyer can achieve, or states or implies that the lawyer can achieve results by means that violate the Rules of Professional Conduct or other law;

(3)   compares the lawyer's services with other lawyers' services, unless the comparison can be factually substantiated; or

(4)   contains any paid testimonial about, or paid endorsement of, the lawyer without identifying the fact that payment has been made or, if the testimonial or endorsement is not made by an actual client, without identifying that fact.

[5] SCR 22.07 provides, in pertinent part:

**Investigation.**

. . .

(2)   During the course of an investigation, the administrator or a committee may notify the respondent of the subject being investigated. The respondent shall fully and fairly disclose all facts and circumstances pertaining to the alleged misconduct or medical incapacity within 20 days of being served by ordinary mail a request for response to a grievance. The administrator in his or her

329

¶ 20.   The sixth matter addressed in this proceeding concerns Mr. Strasburg's dealings with a man who lived in a residential facility for the elderly and who had no close relatives. That man had consulted Mr. Strasburg in May, 1994 concerning an annuity he owned that was due to be renewed. Pursuant to that consultation, Mr. Strasburg drafted a custodial trust for the benefit of eight charitable organizations and the legal documents for that trust, including a transfer under the Wisconsin Uniform Custodial Trust Act and a declaration of trust, each of which designated himself as custodial trustee for the benefit of the charities. He used a legal form to prepare a statutory power of attorney appointing himself the man's agent authorized to handle his property, and he prepared a health care power of attorney and a declaration to physicians on forms furnished by the Wisconsin Department of Health and Social Services. Those documents desig-

discretion may allow additional time to respond. Failure to provide information or misrepresentation in a disclosure is misconduct. The administrator or committee may make a further investigation before making a recommendation to the board.

(3)   The administrator or committee may compel the respondent to answer questions, furnish documents and present any information deemed relevant to the investigation. Failure of the respondent to answer questions, furnish documents or present relevant information is misconduct. The administrator or a committee may compel any other person to produce pertinent books, papers and documents under SCR 22.22.

[6] SCR 21.03 provides, in pertinent part:

**General principles.**

. . .

(4)   Every attorney shall cooperate with the board and the administrator in the investigation, prosecution and disposition of grievances and complaints filed with or by the board or administrator.

nated Mr. Strasburg as the man's health care agent and one of Mr. Strasburg's employees as alternate.

¶ 21.   The proceeds of the annuity, approximately $215,500, were used to fund the trust, and shortly thereafter Mr. Strasburg disbursed $50,000 of that amount to himself, purportedly for the man's medical or nursing home expenses. Mr. Strasburg then deposited that $50,000 into a checking account he had opened in the name of the trust and immediately issued a check from that account to himself in the amount of $49,650, which he deposited into a checking account he opened that day in his own name. On the same day, when the only funds in his own account were funds belonging to the trust, Mr. Strasburg issued a check for $35,000 payable to ElderCare and deposited it into another checking account, not identified as a trust account. He then wrote seven checks totaling $14,000 on that account and deposited them into an account at an investment broker where he had established a family trust in which he was grantor, trustee, and sole beneficiary. Those checks, each in the amount of $2000, were not in numerical sequence and bore different dates to make it look as if they had been issued over a period of six months. In fact, all of them were deposited with the broker on the same day. Prior to depositing the funds from his client's trust account, the funds in the account on which he wrote those checks were insufficient to pay all of the checks.

¶ 22.   Mr. Strasburg also used almost $14,000 of this client's trust funds to pay for newspaper advertising for his business. In addition he took $14,000 of the man's funds from the family trust account and deposited it into a joint checking account he had with his wife.

■■■■■■■■■

■■■■■■■■■

¶ 23. In January, 1995, Mr. Strasburg prepared a schedule of assets over which he exercised authority and control as custodial trustee of the client's trust, attaching to it the transfer document and the declaration of trust he had prepared for the client. That schedule misrepresented the amount of funds in one of the accounts as $49,650, when in fact only $350 remained in it after Mr. Strasburg used the balance for various matters unrelated to the trust. Thereafter, in August, 1995, Mr. Strasburg transferred $51,307 from his own money market account, that had been funded with this client's funds, to a brokerage account in the name of the trust.

¶ 24. Although obligated by law to do so, Mr. Strasburg did not give seven of the eight charitable beneficiaries written notice of the client's trust describing the trust property and did not notify the eighth charity that he had accepted trust property on its behalf until over a year after he had taken control of the trust assets. He failed to provide any of the beneficiaries annual written statements required by statute concerning his administration of the custodial trust properties, and none of them received any funds from the trust.

¶ 25. When the client asked him for a copy of all documents, including trust and investment statements and the statement of his fees to be charged, Mr. Strasburg sent him a copy of the documents he had drafted to create the trust but, other than the schedule of assets attached to those documents, did not provide any investment statements or information concerning the location of all the trust assets. He also misrepresented to the client the balance of one of the accounts, which had been overstated on the schedule of assets,

332

and he did not provide the client any statement concerning his past, current or future fees.

¶ 26.   Mr. Strasburg did not respond to numerous inquiries from the Board concerning his dealings with this client and the trust, and he did not appear or produce his file in the matter. He asserted to the Board that he was not required to attend an investigative meeting because he was not engaged in the practice of law and his client records were confidential.

¶ 27.   The referee concluded that Mr. Strasburg engaged in the practice of law and law work activity customarily done by law students, law clerks or other paralegal personnel in this matter by drafting custodial trust documents, a statutory power of attorney and a health care power of attorney, and a declaration to physicians, in violation of SCR 22.26(2) and 20:5.5(a). He also charged the client an unreasonable legal fee in respect to the work to be performed, in violation of SCR 20:1.5(a), and engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation, in violation of SCR 20:8.4(c), by using trust assets for matters unrelated to the trust, by transferring trust assets through multiple accounts, most of which were not designated trust accounts, by failing to notify seven of eight beneficiaries of the existence of the trust and provide any of the beneficiaries with annual statements regarding his administration of it, and by misrepresenting to the client the balance of one of the accounts. His failure to cooperate with the Board's investigation into this matter violated SCR 22.07(2) and (3) and 21.03(4).

¶ 28.   As discipline for his conduct in all of these matters, the referee recommended that Mr. Strasburg's license to practice law in Wisconsin be revoked and that he be required to make restitution of the $2500 advance fee paid by a woman and her sister for

services to be performed for their father, which Mr. Strasburg refused to refund when they terminated his services. The referee specified that the restitution should be paid to the father's estate, as the daughters had used the father's funds to pay Mr. Strasburg's fee. In addition, the referee recommended that Mr. Strasburg be required to pay the costs of this disciplinary proceeding. In the matter of the contempt, the referee recommended imposition of a remedial sanction of a $500 forfeiture for each day Mr. Strasburg continues to engage in the activities specified in this proceeding as constituting the practice of law in violation of SCR 22.26(2).

¶ 29. In this appeal, Mr. Strasburg first contended that the recommended remedial contempt sanction is improper because it is based on the 1990 license suspension order, which he asserted will be superseded by the order issued in this proceeding—one he has not yet been found in contempt of. Further, he argued, the sanction would be imposed for past conduct—his business activities since the 1990 license suspension—and for which he is unable to purge the contempt.

¶ 30. We find no merit to Mr. Strasburg's contentions. The referee found him in contempt of the court's order issued in the license suspension proceeding requiring him to comply with SCR 22.26, including the prohibition of engaging in the practice of law or in any law work activity customarily done by law students, law clerks or other paralegal personnel. The order in the instant proceeding will continue that prohibition, whether Mr. Strasburg's license were to remain suspended or be revoked. Thus, his obligation to comply with SCR 22.26(2) is a continuing one, not one that arose upon issuance of the license suspension order

and will cease and recommence when the order issues in this proceeding.

¶ 31.   Also, the contempt sanction we impose in this proceeding, while based on the referee's determination that Mr. Strasburg was in contempt of the court's 1990 order, is a prospective forfeiture, applicable in the event Mr. Strasburg continues to engage in the activities for which he has been held in contempt. Contrary to his assertions, Mr. Strasburg has the ability to purge that contempt merely by ceasing to engage in those activities.

¶ 32.   Likewise without merit is Mr. Strasburg's assertion that the appropriate response in the event he continues the business activities found to have constituted contempt is referral to the district attorney for possible prosecution under the unauthorized practice of law statute, Wis. Stat. § 757.30. The activities proscribed by SCR 22.26(2) are not limited to those specified in the statute. Moreover, it is the contempt of this court, not a criminal violation, for which we impose a remedial sanction.

¶ 33.   Mr. Strasburg next argued that he should not be required to make the restitution recommended by the referee for the following reasons: the money used to pay his fee came not from the persons to whom restitution would be made but to their father; restitution is not properly an instrument of punishment for his conduct but is a remedy for a person who has been harmed; there was no showing that the father was harmed by his conduct. None of those assertions has merit. They ignore not only the fact that the recommended restitution is to be paid to the father's estate but also that Mr. Strasburg performed no services to warrant his retention of the $2500 payment he received for those services.

335

¶ 34. Finally, Mr. Strasburg argued that he should not be required to pay all of the costs of this proceeding for the reason that he never opposed the license revocation sought by the Board. He contended that the Board needlessly pursued the revocation and, consequently, should not be entitled to recover its costs incurred in doing so. That argument fails to take into consideration that it was Mr. Strasburg's conduct that made this disciplinary proceeding necessary and that his refusal to obey the license suspension order by engaging in activities prohibited by SCR 22.26(2) required the Board to establish the facts and circumstances that would warrant the revocation of his license. Further, before this proceeding commenced, Mr. Strasburg could have petitioned for the consensual revocation of his license, which would have required that he acknowledge his inability to defend against the misconduct alleged; during the proceeding he could have entered a no contest plea or, at a minimum, stipulated to the allegations of misconduct. Mr. Strasburg chose none of those options but instead refused to submit to the discovery sought by the Board and, other than by his initial denials of misconduct, refused to participate meaningfully in the proceeding. Nonetheless, the Board was required to establish, albeit by default, an appropriate basis for the revocation of Mr. Strasburg's license to practice law.

¶ 35. Having found no merit to any of the arguments raised in the appeal, we adopt the referee's findings of fact and conclusions of law and determine that the revocation of Mr. Strasburg's license to practice law in Wisconsin is the appropriate discipline to impose for his misconduct established in this proceeding. We also adopt the referee's holding in respect to Mr. Strasburg's contempt of our 1990 license suspen-

sion order and impose the remedial sanction recommended. In addition, we require that Mr. Strasburg make the restitution recommended by the referee and pay the full costs of this proceeding.

¶ 36.   Because the remedial contempt sanction we impose is prospective, we rely on the Board to monitor Mr. Strasburg's continued activities in connection with his business. In this appeal, the Board asserted that in the course of ascertaining his compliance with a license revocation order, it will be in a position to determine whether Mr. Strasburg has continued to engage in law work and, if he has, to bring a motion asking the court to enforce the contempt holding by imposition of the remedial sanction. The court then will determine whether Mr. Strasburg's contempt continues after requiring him to show cause why the sanction should not be imposed.

¶ 37.   IT IS ORDERED that the license of John W. Strasburg to practice law in Wisconsin is revoked, effective the date of this order.

¶ 38.   IT IS FURTHER ORDERED that, as remedial sanction for his contempt of this court's March 15, 1990 order, John W. Strasburg pay a forfeiture of $500 per day for every day his contempt of court continues following service of this order upon him.

¶ 39.   IT IS FURTHER ORDERED that within 60 days of the date of this order, John W. Strasburg make the restitution as specified in the report of the referee in this proceeding.

¶ 40.   IT IS FURTHER ORDERED that within 60 days of the date of this order, John W. Strasburg pay to the Board of Attorneys Professional Responsibility the costs of this proceeding.

¶ 41.   IT IS FURTHER ORDERED that the provision of the March 15, 1990 order requiring John W. Strasburg

to comply with SCR 22.26 continues in full force and effect.